152285, International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America et al. v. Kelsey-Hayes Company et al. Oral argument not to exceed $15,000 per side. Mr. McNair saw for the defendant's appellate. Good morning, Your Honors. I'm Greg Mersall, and I represent the defendant's appellate in this case. And I'd like to reserve five minutes for rebuttal if I could, please. Let me start with what might be a hope as the easiest issue in the case, and that's the role of Northrop Grumman in this matter. Northrop Grumman had nothing to do with the facts giving rise to this case. They had nothing to do with negotiating the contracts or the operation of the plant. They had nothing to do with the changes in the health care benefits that are at issue here today. What it did was after the plant was closed, after the contracts were terminated, it acquired the corporate parent of Kelsey-Hayes. It owned it for about a year and then sold it back in 2004. There's no theory under which Northrop Grumman is liable for that. It's a matter of simple corporate law, not alter ego, not joint employer. There simply aren't the facts to support it, and it should have been dismissed from the case and certainly not subject to the injunction that gave rise to the appeal here. With that, I do note that we did assert this before the district court. We asserted it in our brief. The union hasn't even responded to it. It shouldn't be an issue in this case. So let me turn to the main attraction, which is, of course, the application of the Tackett decision after 30-something years of Yardman. This is the third Yardman case to reach this court since the original Tackett case. We've got Tackett, what we call Tackett III now. We've got the Gallo decision, and of course I'm acutely aware, Judge Strange, that you dissented from that decision. And then we have this case. I know the court's familiar with those holdings. There's really only three cases we're talking about, which would be Tackett, Gallo, and the two Tackett decisions and Gallo. So let me talk a little bit about the contract in this case. And, Judge Strange, with respect to you, I don't necessarily agree with what you put in the dissent, but I'm going to address a number of facts here that I think will allay some of the concerns that you had in that case and that also we think point to why, even under your dissent, the decision in this case should be overturned. Let me start just briefly with the structure of this contract, which is kind of unusual. We've got the main collective bargaining agreement, as you might expect, the little thing you stick in your back pocket if you're a worker. We've got a supplement, H, which contains, it's about five pages long, and it talks about the company's going to implement a health care program, and then the terms of that program are set forth in supplement H1. H and H1 together are about 140 pages or so. The first thing we're going to talk about, which I would not have talked about two years ago, is the termination clause. There is a general termination clause in the agreement, which under Yard Man and its progeny would have been irrelevant. That's not true anymore. That's a critical part of this contract. And let me talk even further on that. It's not only specific to the contract, the general clause is to the contract as a whole, but it's also repeated again or referenced again in supplement H. So we now have not just a general termination clause, but we have a termination clause that specifically applies to benefits and to changes in the benefits in the future. And section 10. Yes. So this case is already distinguished in light of the Tackett cases. This is a contract of limited duration, not just in general, but we also have a specific clause applying to insurance. And when you wipe out all the old Yard Man law, that alone means this is a contract of set duration. Now the union is hanging its hat in language in supplement H.1. That's the part that describes what the coverage is. And the operative word really is continued, that the benefits will be continued. Okay. The word lifetime doesn't appear as to these benefits, which I'll get back to in a minute, nor does vested, nor benefits for life, or any synonym like that that I suspect we're going to hear about today when people try to describe these benefits as being lifetime benefits. Lifetime is an easy word. It's only eight letters. In contrast to the health care provisions, which don't say lifetime vested for the life of the retiree, or simple words like that, there is such a reference in connection with life insurance. It's on page 463 of the record where they say flat out, they will continue for the lifetime of the individual. And the ordinary contract construction rules say that if we put language in one place and not another, that implies that they don't belong. So this contract, supplement H1, actually supports the conclusion that these benefits don't vest. I have some preliminary understandings that I need you to help me with. Explain to me, I understand that you say that the 1998, the general durational clause, survived the termination, and that that's what controls here. Help me understand where you say specifically these health care benefits were terminated. Is it your position that they were not terminated by the 2001 agreement, or that they were terminated by the 2001 agreement? Let me start by saying, I'm going to reverse your question a little bit. It's not really when they terminated, it's how long they continued. And so the contract, the benefits only continued for the life of the contract, which would have expired with the contract, which was a three-year deal. And, of course, that contract was later terminated even further by the plant closing agreement. Now, I'm going to talk about the plant closing agreement for a minute here. It doesn't apply. Now, you may say, well, why am I so sure of that? Because this court held it doesn't apply. As you might remember, I don't think any of these judges here today were on that panel, but we actually moved to arbitrate these claims under the arbitration provision contained in the plant closing agreement. The union argued vociferously and repeatedly and ultimately successfully that they weren't bound by it because it didn't apply to them. So that plant closing agreement doesn't apply. All it says in any case is that they're terminating the old agreement and that whatever benefits might have survived were exempted from the release. The plant closing agreement doesn't have any further perpetuation language in it. So the 1998 general durational clause governs here? That's correct. For this group? That is correct. Help me understand how the record shows that you have terminated under the 1998 duration clause. It's a different clause from what was in Moen. That termination clause says that it has the notice provision. I think it's Article 16, termination. It continues in full force and effect without change through February 1, 2002. But if either party desires to terminate, they have to give notice. Well, I have two answers to that. And the agreement shall continue in full force and effect. I have two answers to that. First of all, the language of the agreement is it is a three-year agreement and it shall continue in full force and effect without change through February 1, 2002, which implies, okay, after February 1, 2002, we can make whatever changes we want to. Well, no, it doesn't really say that. Because what it says is if either party desires to modify or change this agreement, it shall six months prior to February 2, 2002, or any subsequent February 2, give written notice to such effect. And within ten days after receipt of that notice, a conference will be arranged to negotiate the proposals, in which case this agreement shall continue in full force and effect until terminated as provided herein. I don't see anything in the record that indicates that there was a written notice of modification, nor that there was a ten-day, provided within the ten-day period, nor that there was a conference arranged, nor that there was negotiations on the proposal. So why is this agreement not, by the duration clause itself, continued until those provisions are met? Because the parties did do all those things, and the evidence in the record is the termination agreement. Where is there no evidence in the agreement of these documents of the notice itself? There is not. There is the plant closing agreement itself, which reflects that there were negotiations going on, that the parties met, that the parties reviewed the terms, and that they terminated the agreement. And the plant closing agreement itself terminates the agreement. Well, then the plant closing agreement applies here. If that's how you satisfied the duration clause of the 1998 collective bargaining agreement, which you say governs here, then the way you terminated the health care agreement is through the 2001 document. There's a couple of steps in between, which is that the plant closing agreement reflected all of the things that you just said, which was that the parties, that there was notice given. Obviously, the plant was being closed. They negotiated over it, and they terminated the agreement. What this Court held before, though, was the contractual commitments contained in that agreement did not apply, particularly the arbitration provision, to these retirees. So we did satisfy the termination provision of the agreement through that mechanism. So what? I'm still struggling with if the way you satisfied it was through the 2001 agreement. I can understand perhaps there's no remedy question, but the terms that would now cover the health care that was provided are terminated, the 1998 agreement is terminated, by the methodology established in the 2001 agreement. Let me just go back to the arbitration decision that this Court made, and it was argued before. I think we're looking at two different issues, which is, one, are the retirees bound by the agreement? And what this Court held was, gee, the retirees are not bound because they're retired at that point. The union no longer represents them. That doesn't stop us from satisfying the termination provision of the contract by tendering the exact same notice. So in terms of the agreement itself, they're not covered by that. But in terms of the fact that it terminates the agreement and it satisfies the requirements of the contract, it certainly does that. Let me ask you, I've got two questions. One, I gather your client's position is that the contract is unambiguous. That is absolutely correct. Now, if that's so, do you concede, though, that if we did get to extrinsic evidence, that that would lean in favor of lifetime benefits? No, for three reasons. And I see I'm out of time, but I'll answer them as quickly as I can. First of all, the Supreme Court held in the Tackett decision, ambiguous promises should not be construed to provide lifetime benefits. It's only for a reasonable period of time. And I would submit that 15 years on a three-year contract is a very reasonable period of time. Secondly, we don't believe that this contract unambiguously provides these benefits. Third, if you look at the evidence that was submitted by the union, it actually excludes major medical coverage from the intent here. And I'm referring specifically to three declarations that were submitted in this case, Helwig, Burke, and there was one other one. And in all of those, they suggested, they testified, that major medical benefits were excluded from the discussion regarding lifetime retiree coverage. Well, you know, it sort of raises the question, why would your company for 14 years continue these benefits if it had no obligation to do so? My answer is real simple. Yard Man and its progeny. We were under that decision for 30-something years here. This Court addressed something like, I believe it's 23 different Yard Man cases. The defendants lost, I believe, in 21 of those. The answer is that we were under Yard Man. And we can't, Yard Man doesn't perpetuate itself. That was the holding of the majority in the Gallo case. Well, then why, in the extrinsic evidence arena, did you not seek to negotiate a different statement in the contractual arrangement? You have a whole series of cases in which, and I understand they were under Yard Man, in which a court says, here's the language, here's what it means under Yard Man. Now you come to the next negotiation schedule with the union, and you say, we understand what that language means. We've already been told that. We want to negotiate different language because we're not willing to continue to pay health care. But I don't see anything in the record that indicates, in this extrinsic evidence arena, that you negotiated any different language that would then have availed you of the ability to say, we're not doing this. The simple answer for that is the parties basically left it for whatever the courts do in the future. The Yard Man case, we don't have extrinsic evidence on either side regarding that. The Yard Man— Well, you do have extrinsic evidence because you left the language that you knew what it meant in the collective bargaining agreement. Actually, I disagree with that, Judge, because we knew what it meant in four states. We didn't know what it meant in the other 46, which were at odds with Yard Man. And there was always the possibility that 33 years later, the United States Supreme Court would find unanimously that Yard Man was wrongly decided. So the parties left it to the future, and the future was the Supreme Court hadn't spoken yet. Now it has. If we could maybe save any more questions for you. Are you okay? Thank you, Your Honor. Mr. Wertheimer. Yes, Your Honor. Good morning, Your Honors. Bill Wertheimer on behalf of Appellees. I'd like to focus on three arguments that do not in any way rely upon either Yard Man or Tackett or Gallo versus Moen. The first has been referenced, and that is the closing agreement. The closing agreement in this case applies to these retirees. It terminates the contract a year early, and it excludes from the termination expressly two things. Pension benefits and health insurance benefits. And it does not have a duration clause. Before Yard Man, the Seventh Circuit, which had not been enamored of Yard Man, issued termination case decisions in which it said, the Temme and Zielinski cases, in which it said, in that circumstance, which is our circumstance, the benefits are obviously lifetime. There is no termination clause, so you don't get to Gallo, you don't get to Tackett at all. There is no duration clause in the operative agreement. There is a duration clause in Supplement H. It's Article 10. Supplement H was terminated by the termination agreement. My point is that the termination agreement continued. It was the party's effort to end everything except the two things that wouldn't end, pension benefits and health insurance benefits for retirees. And both the district court and the arbitrator interpreted the termination agreement that way. And in fact, in the briefing at least, Kelsey Hayes didn't disagree. There's no other way to interpret it. They cited a case from this circuit having to do with judicial estoppel. Somehow we should be estopped from our argument that we win under the termination agreement because we, under judicial estoppel, misled this court and the district court because we made the arguments we did relative to the duty to arbitrate under the closing agreement. We did no such thing. When we filed our complaint, we alleged that all of the retirees were covered both by the 98 agreement, which is what created the benefits, and by the closing agreement. That's in our complaint. We didn't hide anything. We argued that the arbitration provision should not apply to retirees. And we were successful in part with the district court and with this court as to those retirees who are here today. That's all. We didn't hide them all. Let's assume you're right that the plant closing agreement, which was in 2001, did not control the termination of the health care benefits. But then why would that mean that, okay, the health care benefits continued on for another year until the CBA expired, which was in February of 2002? Well, no, because the termination agreement, Judge, by paragraph two, it terminated April of 2001. That is what the parties did is they moved up the termination date by a year. At the same time, they were excluding pension and health benefits. So you're saying that overrode the duration clause in Supplement H and in the CBA? Absolutely. Supplement H is gone. I mean, it's a release. It's the party's effort in a closing context to release all obligations. That just opens up the life care for health care benefits for a lifetime. That's right. Because then in paragraph five, the parties agreed the release contained in paragraph one above, notwithstanding it, with respect to any pension plan or payments to retirees shall be governed by applicable law and benefit plans. In other words, that was the exclusion. That's what continued, which is exactly the kind of language that the Seventh Circuit dealt with in these cases. And in the same context, that is, you're in a closing agreement situation. You enter into a closing agreement. By its nature, you're not going to put a termination clause on it. And so that if you provide for benefits for retirees, that in a three-year collective bargaining context would put you in a yard man situation. The Seventh Circuit said it's not a yard man situation in a termination. Okay. Well, let's assume you're right. But then how do you distinguish Gallo then? Because Gallo seems to me very similar to this. It also had a plant closing agreement. It did. Termination of a CBA that had health care benefits that were alleged for life. But the majority in Gallo says no. Well, two points. One, I probably shouldn't start with this, but I will. We prefer the dissent in Gallo, particularly as to its analysis on that. But second, the language is different. The majority in Gallo talked about somehow the reference to the CBA brought back in the termination clause. We don't have that language here. So that the language is different. If you look at the majority opinion in Gallo, the majority opinion in Gallo didn't say closing agreements are irrelevant or you still need termination clauses. The majority opinion in Gallo said there's a reference to the CBA, and that reference brings in the termination clause so retirees still lose. Here we don't have that. We just have a flat statement. And Kelsey Hayes doesn't claim otherwise. There's nothing in their briefing claiming that the contractual analysis that the majority did in Gallo should apply here. Because it doesn't. The words are just different. What it saved, so to speak, in the 2001 agreement was the program of insurance, which was the program agreement under H, and the specifics under H1. It just defined benefits? Yes. Just defined benefits? That's right. That's right. Okay. But when they terminated, they just referred generically to retiree health care. I have a second and hopefully time for a third argument. The second is this court decided a Kelsey Hayes case way back in the 90s involving the same parties, the same plant, the same contract language. This court decided on a preliminary injunction basis. But the district court, Judge Godolo, granted summary judgment in 1997. And if you go back to the decision and just look to the headings, there was overwhelming evidence that everybody understood that the benefits were lifetime. The headings are the SPDs. The SPDs said they were lifetime. The strike situation, they paid them during strikes. The sales situation, they recognized the lifetime obligation in various sales. Exit interviews, internal documents. There is a mountain of evidence that the parties understood here, and this is part of our context, that the benefits were lifetime. And then in 1997, Judge Godolo issued his decision finding that the benefits were lifetime. The parties settled that case and then in 1998 entered into the 98 agreement with the same language. Now this court in Tackett 3, what I call Tackett 3, Tackett on remand, made the point, the two points this court made in addition to the various points that the opinion and the concurrence in Tackett had made, the only additional points this court made in Tackett 3 were that an ordinary principle of contract law, a la Tackett, is that the parties understand that they're incorporating existing law. Citing Williston, and Williston said that includes common law. And the second point was, that this court made, changes in the law don't count unless the parties say at the time that they're going to contemplate changes. What does that mean here? Pretty clearly it means, I mean maybe it means you've got to recognize yard man. At least as to parties who are negotiating at the time yard man's in effect. But we don't have to go anywhere near there. We can say that what this court had to have meant, or maybe not specifically thinking of this case obviously, but it fits like a glove. Here you have parties that have litigated language, found to be lifetime, and then agree the next year to the same language. Of course they understood it to be lifetime. Why would they do anything differently? And we cited in our brief, it's not just this court's interpretation of Tackett in Tackett 3, but the Supreme Court carbon fuel case, an older case, talks about a similar concept. That parties are understood to have incorporated whatever existing law is that applies. So we think this case in context is different from Gallo versus Moen in that respect. None of that is present there. And this doesn't rely upon Tackett at all. It relies upon what the Supreme Court in Tackett said. That the main point is, what was the intent of the parties? And how could the intent be any clearer in 1998? And it has to be contemporaneous intent. That's when they signed the agreement. There is really no counter to it. That's why they have to argue that Tackett, accompanied by Gallo versus Moen, must be read to mean that in any case, if you don't have the words lifetime or the equivalent, and you have a general duration clause, you lose. That's what Gallo more or less says, isn't it? Well, I would say less. I don't think it goes quite that far. And there's no reason for this court to go that far when you've got these kind of facts. Well, Tackett 3, Tackett 3 itself says that there's no explicit language requirement. That's right. That's right. That's the rule of the circuit. That's right. One final point and a major point, and that is, we won this arbitration that they wanted, that we fought, in front of an arbitrator. And that arbitrator found in our favor as to both the 1998 and 2001 agreements. There is case law, which we cited in our brief, that arbitration decisions are entitled to be considered for res judicata in the broad sense terms. They had their bite at the apple in interpreting this contract. And that arbitrator found that these were lifetime benefits. Engaging in contract analysis, not in reliance on yard man. He did what arbitrators do. He bounced around the contracts that, you know, that counsel talked about, H and I and da-da-da, and said these are lifetime benefits. Both the 1998 agreement and the 2001 closing agreement make clear that the benefits are lifetime. They are bound by that. They don't get a second chance to go back to the district court. I see my time is up. Thank you. By its terms, the plant closing agreement applies only to the union and not to the retirees. Those aren't my words. Those are the words of the union in the prior brief, the briefing and the arbitration part of this case. They've already said that, in fact, the plant closing agreement applied to the union and not to the retirees. That's not something I made up. We've cited a number of instances where they said not only that, but similar things on pages 9 and 10 of our reply. I guess I understand the remedy argument that they were making. What I'm struggling with is the fact that it is an agreement that references payments to retirees for retiree health care. Under your previous argument to me, you suggested that the 1998 agreement was, in fact, formally terminated and that it was terminated by the 2001 agreement, that that was the methodology. If that's the methodology and that 2001 agreement specifies that there will be payments to retirees for retiree health care and does not include a duration clause, why is that not either ambiguous as to lifetime or a promise of lifetime? I have two answers to that. First, the language does not promise continued payments. What it does is it accepts the retiree health care from the release, which is different. And the release is releasing the 1998 duration and other provisions of the contract and saying it is terminated. So you have, earlier than the duration clause allowed in the 1998 agreement, you have terminated that agreement. I mean, that's what you said earlier. And now what terminates it is paragraph two of the 2001 agreement. Accepted from that are two programs. Well, no more than two programs because they're short-term disability and life insurance. But accepted from that termination are payments to retirees for retiree health care. But the answer is that it doesn't apply in perpetuity at that point. Because the additional language simply said continued, that's not enough to imply a lifetime benefit. That's the question. I think maybe we're finally down to where the nub is of the question. Because now what we have is we have a contractual provision that provides for payments to retirees for retiree health care. And the question before the court is, is there clarity on the intention of the parties as to whether that provision provides for a lifetime promise or provides by some term limitation? Not having a durational clause in this agreement, I don't understand why that would not just create a clear ambiguity and then it throws us into extrinsic evidence, which you say you went on, they say they went on, and that's the call to be made. Let me answer it two ways. And also you had asked a question before related, so let me answer it. In the Gallo case, the court found that the answer has to be in clear and expressed language, adopting the language from this court's en bancs break decision. So there is no clear and ambiguous language. I think Tackett 3 is the governing law in this circuit, and it says there is no requirement of explicit language. The difference then would be the difference between explicit versus clear and express, and you're asking me to get in a dueling Sixth Circuit opinion issued a few days from each other. As a matter of, I mean, the earlier case controls if there's conflict. And, of course, the difference is that we're in a different contractual agreement here. And as explained by your opposing counsel, Moen may not apply because what we have here is what you and I have discussed, is the continuation of a program and an agreement to provide retiree health care. So it's contractually distinct. Then let's go back into Supplement H1, which has disclaimer language in it, that says that the company can change these benefits at any time. And I agree, except that your problem is that sub-supplement H is the governing agreement. Supplement H says at 2129, in the event that there is a conflict between the provisions of the program, H1, and the provisions of this agreement, H, the provisions of this agreement shall supersede. And then it proceeds to list company options and administrations, and five times says that changes shall be made, shall not be exercised except by mutual agreement between the company and the union. So the way to harmonize those two provisions, which is what the rules of contract construction say, is I think the way the parties actually did, which is that once the contract was expired, whatever limitation there was in H1 was gone, and the company could make changes pursuant to Supplement H1 disclaimer language. And the record here shows they did, in fact, do that. They made a number of changes starting, I believe, in 2007. They changed providers. They changed networks. They changed terms. They changed a lot of things. You didn't have an objection from the union to those. No. But you had the requirement of mutual agreement. I don't understand how we have an unambiguous contract if what you've got is Sub H expressly saying that any conflict between it and the program on which you rely, Sub H is the governing document, and it requires mutuality of agreement. Well, let me end then by quoting my own opponent. Supplement H1 is gone at that point, so the limitation contained in H1 is gone as well. And so the company can make changes. So that leaves us with H, and H is the one that gives us. I'm sorry. He said Supplement H is gone. That leaves us with Supplement H1. All right. So let me say, I said I misspoke. And I am surely struggling with ambiguity here, because I'm not seeing that we are, that there is any clarity. Excuse me. I still don't understand. I want to know your answer to Mr. Wertheimer's point that when the plant closing agreement did away with all the duration limits in the CBA and in Supplement H, and therefore its duration is unlimited for health care benefits. What's your answer to that? I have several answers to that. First of all, the contract was terminated, so that terminates the contract itself, including whatever limitation, including everything. And so if, in fact, we're going to bring into play the retiree benefits, they're still subject to the provisions of the contract that apply to the retiree benefits, which would include the durational clause that relates to Supplement H1 and Supplement H. But our view is that when the contract terminated, that terminated everything. What the release language simply does is release the language with respect to the retiree benefits themselves. It doesn't relieve it of the termination provision, nor does it say it's going to be continued for life. The word simply continue there doesn't do it, particularly when you throw in the disclaimer language that's in there as well. You can't simply divorce, tear the contract apart to pick and choose which pieces you want to apply. All right. If there are no other questions, your time is up. Thank you. We thank you both for your argument. We'll consider the case carefully. The court may call the next case.